The next case today is 231531. B.R.S. Real Estate, Inc. v. Certain Underwriters at Lloyd's, London, et al. Will counsel for the appellant please come up and introduce yourself for the record. Good morning, Your Honors. Attorney Nicole Labonte here on behalf of the appellant and plaintiff, B.R.S. Real Estate, Inc. in this matter. If I could reserve two minutes for rebuttal, I'd appreciate that. You may. Your Honors, notwithstanding the order of the appellant's brief, I'd like to focus on the two main issues that are at the crux of this appeal. One being that the appellants have shown enough under the relatively low Rhode Island standard to avoid the confirmation of an appraisal award under an insurance policy in a summarily decided fashion like it was here. Specifically, the appellants have shown that there was at least a reasonable impression of partiality in more than the mere appearance but less than actual bias on the part of James Boudreaux who was the appraiser appointed on behalf of the insurance company for this appraisal process under an insurance policy. Then I'd like to go on after that and argue the other main issue at appeal, which is that the appellees did not meet or sustain their burden under summary judgment of showing that they were entitled to summary judgment on counts two through four of plaintiff's complaint, which were somewhat passed over in a way by the court below and even in arguments here, where the appellees did not show that there were no genuine issues of material facts in dispute or that they were entitled to judgment as a matter of law. Regarding the first issue that is really at the crux of this whole case about this appraisal award that was issued under a commercial insurance policy after a significant water loss in West Warwick, Rhode Island. Under Rhode Island law, the Rhode Island Supreme Court has decided that essentially the same statutes in Rhode Island that apply to court-ordered and court-binding arbitrations apply to an appraisal process under an insurance policy. Notwithstanding that an insurance policy is really a contract of adhesion and the insured has no say in these contract provisions, in any event, I think probably that is the reason why that the courts have gone on to interpret that standard, that essentially you are somewhat stuck with the results, for lack of a better term, of an appraisal under an insurance policy. Counsel, isn't it a fact that your client objected for the very first time to the appraisal award? That is... Can I please finish the question? After they got an appraisal they didn't like. Everything they knew about Mr. Boudreau, they knew at the time that he was appointed, but they did not register any objection at all. Again, it is only after they got a result that they didn't like. Isn't there a serious waiver issue there or some equitable basis for objecting to the timing of it? I find that very problematic. Understood, Your Honor. My response to that would be that there is no provision in the insurance policy, and express terms that requires either party to object. There is no such process. It is very specific in the insurance policy, exactly what you do. One side appoints their side, the other side appoints their side, and then those two choose an umpire and it goes on. In addition, I point to the fact that there is no Rhode Island law that has been cited or that I have been able to find that would suggest that that is a waiver here. In addition, there really was no way for a layperson, frankly, like this public adjuster, or the insured themselves to have known that, number one, partiality or bias was this big issue under Rhode Island law until they got counsel well after the facts. In addition, many of the facts that came out regarding the partiality of this particular Mr. James Boudreau did not come out until the decision. In fact, there was a summary judgment motion and a motion to confirm the appraisal award that was previously denied by the United States District Court. And the reason was because more discovery had to be done. Through that discovery, it was found that Mr. Boudreau was much more involved than my clients would have ever known at the time. He had actually gone and helped to prepare the very estimate in June 2019 that was referred to the district court. It was relied upon by Rebecca Gerard, who was a Lamarch Associates agent for Lloyds of London. Went on for several months to rely on that same estimate prepared by Mr. Boudreau and others at Vertax Companies. And then later on, the appraisal process was requested. And through the appraisal process, in a manner that couldn't have been known to my client at the time either, the appraisers and the umpire had always kept relying on that same estimate. And that was essentially adopted as the appraisal award at the end. But isn't even in arbitration, forget about insurance contracts, when you have this type of arbitration format where each side picks an arbitrator of its own, under Rhode Island law and under the law of essentially all the states, isn't the expectation that each party kind of picks a hometown ref, someone who looks at it their side, and that's why the two of them then have to agree on the third one. And the third one is often called the neutral. And the third one is the key decision maker in the case. And isn't that what happened here? That is how it goes, Your Honor. Your client appointed a hometown ref as well. That is true. And that often does happen, and perhaps that's part of the flaw in the process, especially with respect to insurance company appraisals. I think the bottom line is that the legislature in Rhode Island didn't draft that statute for arbitrations with insurance appraisals under a contract in mind. That being said, what you're saying is completely correct, that in practice it is often done that one side chooses someone who they think will be on their side, the other side chooses someone who they think will be favorable to them, and the umpire is supposed to be neutral. Here this umpire is someone who works for insurance companies on a regular basis. My client had no say whatsoever in that umpire, and maybe in the future my client won't choose the same person on their side. Judge Kayani just pointed out that the two designees to the panel then had to agree on the umpire's side. So through the designee of the insured, they did have a say as to who the umpire would be, did they not? They did, through their appointee, but I would argue that once that appointee is appointed, really nobody should be interfering at that point. Even though I know there's been allegations that even my client's public adjuster interfered somewhat with the whole process in general, which I would say just points to the fact that the entire process seemed very biased in nature. Let me say, these arbitrators, umpires, they're all under oath. That's one of the things opposing counsel points out. Doesn't that carry any weight? It does, and I would say that that could be argued in any case that's similar to this one. So on any case that might be on appeal on this very issue of partiality, when you're arguing that someone had some kind of partiality that was beyond that which was really allowed, I think you're going to have to argue by necessity that you're questioning that person's oath. They all have to sign an oath saying that they were partial in nature. So that's the whole question at issue here. Well, the Rhode Island Supreme Court has said that in assessing partiality in a three-person party-appointed situation, you have to balance the normal considerations against the fact that the whole purpose for this format is to ensure that each side has its side represented by a sympathetic person. So when you then come in and say, hey, they picked someone who's going to be sympathetic to them because they knew they'd already looked at them, that sounds like you're saying this fits just what Rhode Island Supreme Court told us this was designed to work for. Your Honor, what I would say to that is that all the cases cited have to do with arbitrations in regular court cases that have nothing to do with insurance policies. Here, this is a contract of adhesion, something my client had no say in what language it had. It simply wasn't designed for the situation, albeit it applies. But I thought the Rhode Island Supreme Court has pointed out that arbitration really is the proper analogy for this very process. So why isn't the arbitration process an appropriate lens through which we should look at what was going on here? I think the Rhode Island Supreme Court has made it very clear that we must look at it through that lens. My argument was more that because it's a situation that was not necessarily contemplated by the legislature when creating these very strict rules, this is especially a situation where at the very least when one of the parties, especially the insured, it's basically be uninsured or agree to this contract. So essentially they don't have the ability to say I want to be in an arbitration contract or not. Because of that, I'm just asserting that if there's at least a question, it's a reasonable person's standard, at least a reasonable person could conclude that there's an impression of partiality that's not, it's less than actual bias but the impression of bias. This sounds like an argument that you never made. You've referred to a contract of adhesion in some sense. Are you suggesting that your client should not be bound by the terms of this insurance contract and the process that it provided for? Not at all. The reason I'm mentioning that is because of there is, you mentioned something about equitable reasons that you might apply this somewhat differently. My assertion was that equitably speaking it's not the same thing as a contract you negotiate and you agree upon an arbitration provision. All insurance policy contracts essentially have this appraisal provision in Rhode Island. They don't have a say in it. They simply must be agreeing to it or not insured at all. That was my only point. So there might be equitable reasons to especially interpret these with extra scrutiny. I have one quick question regarding your claim for replacement costs. Yes. Is there anything in the record, did you ever provide in the record any indication of identifying what the costs, what proportion of the costs spent on the rehab were necessary to bring the facility into its original condition as a vacant grocery store as opposed to a laundromat? It was, as I understand it, the facility was a vacant previously used grocery store. Correct. They had the flood. You then paid someone to renovate and repair it and they turned it into a laundromat with almost $400,000 worth of laundromat equipment and presented an invoice for that. Was there ever any invoice or calculation of what proportion of those costs were necessary just to replace the prior setup? There was not itemized invoices presented. There were checks that were more than one check that may or may not have had notations in them. I don't remember off the top of my head, but they are included in the appellant's brief and in the exhibits. No, admittedly there were itemized invoices. There was a letter of completion that was well above the amount spent. There was also a good amount of testimony by the various witnesses including the public adjuster as well as Social Construction Limited about what was done in each area. That was always the plan for the property, just as a note. It was bought as an empty market in order to make it into tenant units. This one unit is a laundromat, just to be clear. I thought there was an invoice submitted that reflected $375,000 paid for laundromat equipment. Maybe that figure is overstated, but I thought there was an invoice submitted which reflected the cost of laundromat equipment. How could that possibly be a basis for compensation from the insurer? It was not just laundromat equipment. When the actual claim and the loss occurred, the laundromat was being built. There is an amount that's actual equipment such as dryers and washers and things like that. I don't believe respectfully that that number, $375,000 to $400,000 was just the equipment. I believe that's the higher number for the entire unit itself. But yes, there is an inclusion there. What I will say is that several estimates have already been provided that very clearly section out what the equipment would cost. This was a highly disputed issue throughout the whole process. That's how much it cost. I don't think that changed in any way. The equipment was the equipment and those are costs as opposed to labor. I think that was clear when they submitted their documents. Thank you. Good morning. May it please the court. My name is Bill Schneider. With me today is Richard Hennessey from our firm. I want to start with the replacement cost piece simply because that's where the appellant's argument ended. There was discovery that was conducted in the case. Greg Socha, who is the principal of Socha Construction, testified that it was $375,000 of the invoice that's in the record that was paid for commercial laundry equipment. He also testified that there were additional electrical, mechanical, and plumbing modifications that were made to that building in order to accommodate the laundromat facility. No search was ever performed by the plaintiff or Mr. Socha and no effort was ever made to produce an itemized list of labor and material costs so that the insurer could make a reasoned assessment about what amount of money was spent repairing interior finishes and what was actually spent to perform the upgrades and change in occupancy. And if your honors look at the replacement cost provisions in the policy at the record appendix pages 67 and 68, the insurance company is obliged to pay replacement costs once the property is repaired and replaced. And then there's a limitation in terms of, well, are we going to pay the limit? Are we going to pay the cost to repair or replace? Are we going to pay the amount that was actually spent? In summary judgment, the appellant produced an invoice from Socha Construction, which invoice, by the way, was prepared by the public insurance adjuster and not by the construction company, and that it included checks that demonstrated sums that had been spent. And I think it's important for the court to recognize that underwriters paid the undisputed actual cash value of the appraisal award. So there was $374,000 that had been paid under the insurance policy towards those repairs. And when you add up the checks that are submitted, it's $198,000. So under the Rule 56 standard to carry the burden to show that there is a disputed issue of material fact on this point for trial, I think it was incumbent upon the appellants to come forward and say, listen, we've actually spent this money. Here's the proof of payment. But what they put at the record doesn't support their argument that any payment for replacement costs is due. In terms of the evident partiality in the confirmation of the appraisal award, I think the district court's reasoning was spot on. Mr. Pedro and his testimony is there in full in the record, coupled with the affidavit of Attorney Monahan at the appendix, I think it's 80 through 83, show a thoughtful, deliberative, collaborative process. Mr. Monahan issued a letter on January 16th of 2019, which is in the record, setting out a procedure that the parties would follow. There was no objection to that. Both sides had a full and fair opportunity to visit the property, to say their piece, to submit written estimates,  and this estimate that's been produced towards the end of the record appendix by Vertex, if your honors take a look at the record appendix, particularly pages 239 through 248, Mr. Pedro testifies that that estimate was generated using a software program called Xactimate, and he and Mr. Zalenga agreed to kind of use that estimate as a base to kind of build up from and subtract from as they went through the process of obtaining evidence and making their own observations about the condition of the building. There's simply no evidence in this case beyond the fact that Mr. Pedro worked for a company that did work for insurance companies to sustain the idea that there was evident partiality. And I think when you really dig into the record, what you're going to see is that there really isn't any evidence there. There's no evidence, for example, that he was in the building at some point before the appraisal process. Another engineer, Mr. Ezel, who was a mechanical engineer, had reached out to the public adjuster earlier on in the claim process to set up an inspection of the building. His emails, which are in the record, clearly identify him as somebody working for Vertex. When the independent adjuster appoints Mr. Pedro, she specifically tells the public adjuster that James Pedro from the Vertex companies will be contacting him. So this connection between Mr. Pedro as an employee of Vertex and an engineer of Vertex wasn't some secret that was discovered long after the fact. The estimate itself, you know, the prior Vertex folks looked at the electrical, and that was not something that Mr. Pedro did. His testimony at page 237 of the record appendix shows that it was other folks that looked at that. But, I mean, ultimately, when you look into the estimate itself, Mr. Pedro and Mr. Zelenga adopted the insurance electrical number from this outfit, Foster Electric. So, you know, there really isn't much of a platform or a foothold to argue evident partiality on the part of Mr. Pedro. There's certainly nothing with respect to the umpire, Attorney Monahan. And, you know, beyond the point, the standards that Rhode Island courts have deployed also speak in terms of fairness in the process and some causal relationship between the alleged partiality and the outcome of the award. And I would submit that the simple fact that Mr. Zelenga did not sign the award is not sufficient. There are indications in the record, both from Mr. Monahan and his affidavit and the testimony of Mr. Pedro, that as a result of this collaborative process, they all thought they had an agreement. There is evidence in the record that the public adjuster is reaching out to Mr. Zelenga and telling him, hey, just a reminder not to sign the award. And it's really just sour grapes. Ultimately, you know, there's no objection at any point in time during the proceedings. After the first award was rendered, there were some subsequent proceedings that generated an amended award. Clearly, if there was evident partiality on the part of Mr. Monahan and Mr. Pedro, there would have been no need for them to even reconsider that. But they did, and they came up with an amended award that the record shows Mr. Zelenga was, as we discussed, but he never signed it. Counsel, your opposing colleague has suggested there's something odd about this process. And one thing that I find a bit odd, we have talked about it, the partiality of the representatives to the appraisal panel that are appointed by the insurer and the insured, and yet they all have to sign this oath. I don't have the words in front of me, but essentially it seems to obligate them to proceed in a way that seems somewhat incompatible with that role. I mean, they commit to proceed in a, again, I don't have the exact language, but it's sort of an affair, impartial and objective process. How do you reconcile that oath with the role that everybody assumes they will play as representative of the party that appoints it? Isn't there some kind of inescapable inconsistency in the process in that way? Well, if you look at it through those two lenses, you could make that argument. But here, there's no requirement of a declaration of appraisers. Having been served as an appraiser in Rhode Island, sometimes the parties want a declaration of appraisers signed. Sometimes they do not. But even assuming that, you know, we've got a party appointed arbitrator and there's legal authority for the proposition that they don't have to act, you know, in a strictly neutral basis, I think when you look at the record here, and I find Mr. Bedreau's testimony rather compelling, that it was a fair and impartial process. This estimate, and ultimately that led to the amended award, was nearly three times what the insurance company's independent adjuster had determined based upon her initial visit to the property. So, you know, there's nothing in the record that shows that Mr. Bedreau, despite being appointed by the insurance company and despite the fact that his business does work for insurance companies, deviated from the standard that he agreed to accept by signing the declaration of appraisers. So, you know, I'm not seeing any facts here that say that, you know, his conduct somehow went astray from that. If anything, I'm seeing a lot of information in the record that shows that he was really aligned with that standard that he assumed to accept. Unless there's any other questions. Thank you. Thank you. Thank you, counsel. Will Attorney Labonte, please, if you have two minutes of rebuttal. Thank you, Attorney Nicole Labonte, on behalf of the appellant again. Just to quickly address my brother's arguments with respect to the withheld depreciation and the fact that, you know, the actual cash value has been paid so far and that it's still out there as an issue, that's the whole issue. Right now, it's still on appeal whether this appraisal award should have been confirmed. Therefore, the withheld depreciation arguably is still out there and still could be further supplemented with further information, if necessary. You know, there's nothing in the policy language itself that says you have to present the following in order to get your withheld depreciation. A letter of completion with multiple, you know, estimates, invoices, checks, etc. Counsel, what is the basis for the claim that withheld depreciation should be paid? What is the basis for that? The basis is that if this appraisal award continues to be confirmed, that withheld depreciation is part of that court-confirmed appraisal award. And my client has already proven, but will present further evidence if necessary, to prove that they've spent well over $100,000 for the amount and on the things that are part of the appraisal award estimate itself. To the extent the parties can't agree to that, I would note that we'll probably be back in a courthouse about that. Well, I think when someone moves for a vote, you file the lawsuit saying under the insurance policy you're owed more money. That's correct. That's count two. And then they move for summary judgment. That's right. At that point, you need to come forward with all your evidence as to what would show that you're owed more money. And then at that point, the train leaves the station. You're either on it or you're not. You don't then have a second lawsuit, do you, where you then say, well, now we want to try this evidence. Understood, Your Honor. And I would argue that the evidence that was already submitted was enough to support the withheld depreciation. And I note that I was going to get into the second argument just quickly. I know I'm out of time. But just as a note, it cannot go without saying that the motion for summary judgment was granted on all the counts without ever analyzing all the other issues, breach of contract, declaratory judgment about coverage issues itself, and breach of good faith and fair dealing, et cetera. I would just ask Your Honors to look at that as well, as there was a second whole motion that we have hardly argued about here today. Thank you. Thank you, Your Honors.